## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| LARRY RAY SWEARINGEN, | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO.  H-04-2058 |
| | § | |
| DOUGLAS DRETKE, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

Larry Ray Swearingen ("Swearingen"), a Texas inmate incarcerated under a death sentence, filed a federal petition for a writ of habeas corpus.  (Instrument No. 21).  This action comes before the Court on Respondent Douglas Dretke's motion for summary judgment. (Instrument No. 25).  Having considered the pleadings, the record, and the applicable law, most particularly the operation of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), the Court grants Respondent's summary judgment motion and denies habeas relief.  The Court will certify one issue for appellate consideration.  The Court sets forth the reasons for these rulings below.

## BACKGROUND

A Texas jury convicted Swearingen for the capital murder of Melissa Trotter.  On December 8, 1998, fellow students last saw Ms. Trotter on the Montgomery County Community College campus in the company of a man later identified as Swearingen.  The police quickly marked Swearingen as a suspect in Ms. Trotter's disappearance and arrested him in mid-December for several outstanding traffic warrants.  For nearly a month, the police could find no trace of Ms.

Trotter despite extensive search efforts.  On January 2, 1999, hunters discovered Ms. Trotter's decomposing body in the Sam Houston National Forest.  Ms. Trotter's corpse displayed significant degeneration and desecration from insects and animals.  Ms. Trotter's torso and breasts were exposed, as if someone pulled up her shirt.  A rear pocket of her pants had been torn off, exposing part of her buttocks.  The medical examiner determined that Ms. Trotter asphyxiated from nylon hosiery tied around her neck, but that she also suffered a knife wound to her throat.

On January 26, 1999, a grand jury returned an indictment against Swearingen for the capital murder of Ms. Trotter "by strangling Melissa Trotter with a piece of hosiery, [while he] was then and there in the course of committing or attempting to commit the offense of kidnapping [her]." Clerk's Record Vol. 1 at 3.[1]  The State of Texas later secured an amended indictment which also charged Swearingen with committing Ms. Trotter's murder in the course of an attempted or completed aggravated sexual assault.  Clerk's Record Vol. 1 at 12. The jury instructions authorized Swearingen's conviction for capital murder "in the course of committing or attempting to commit the offense of kidnapping or aggravated sexual assault."  Clerk's Record Vol. 20 at 2874.  A jury found Swearingen guilty of capital murder without specifying under which theory it based that determination.  Clerk's Record Vol. 20 at 2882.  After a separate punishment phase, the jury answered Texas' special issue questions in a manner requiring the imposition of a death sentence. Clerk's Record Vol. 20 at 2904-05.

The Texas Court of Criminal Appeals affirmed Swearingen's conviction and sentence in a published opinion on March 26, 2003.  *Swearingen v. State*, 101 S.W.3d 89 (Tex. Crim. App.

---

[1]     The state habeas record consists of a twenty-volume record, designated "Clerk's Record," containing motions and pleadings filed in the trial court.  The Court will label any reference to the trial transcript itself as "Tr. Vol. __ at ___."

2

2003). Two judges dissented, finding that Swearingen's conviction rested on *factually* insufficient evidence under Texas law. Swearingen filed a state habeas application concurrent to his direct appeal. The state district court entered factual findings and legal conclusions recommending that the Court of Criminal Appeals deny habeas relief on all Swearingen's habeas claims. State Habeas Record Vol. 3 at 472-82. On May 21, 2003, the Court of Criminal Appeals adopted the lower court's findings and conclusions. Based on the lower court's recommendation, as well as on its own review, the Court of Criminal Appeals denied habeas relief. *Ex parte Swearingen*, No. 53, 613-01 (Tex. Crim. App. May 21, 2003) (unpublished).

This Court appointed counsel to represent Swearingen in his federal habeas proceeding. Swearingen filed a federal petition, which he later amended. (Instrument Nos. 19, 21).[2] Swearingen's federal petition raises the following grounds for relief:

- The trial court violated Swearingen's Sixth and Fourteenth Amendment rights by refusing to dismiss three jurors for cause.

- Insufficient evidence supported the underlying felonies of aggravated sexual assault and kidnapping that elevated his crime to a capital offense.

- The jurors in Swearingen's case failed to convict him of capital murder as alleged in the indictment under the beyond-a-reasonable-doubt standard.

---

[2]     In his amended habeas petition, Swearingen indicates that he has recently uncovered evidence that would serve as the basis for a new, likely unexhausted, constitutional claim. His amended petition states his intent "to file a motion for leave to supplement his amended petition with claims based on this evidence, which he is still developing." (Instrument No. 21 at 7, n.5). Swearingen has not filed any motion to amend his habeas petition again. Both the AEDPA's limitations period and FED. R. CIV. P. 15(a) would limit his ability to amend at this late date. *See Mayle v. Felix*, ___ U.S. ___, 125 S. Ct. 2562, 2570-71 (2005). If "the factual predicate for [Swearingen's anticipated claim] could not have been discovered previously through the exercise of due diligence," 28 U.S.C. § 2244(b)(2)(B)(i), he may be able to file a successive habeas petition raising new grounds for relief at a later date, though the rigorous exhaustion requirements of federal habeas review would prevent a federal court from addressing legal theories he advanced for the first time in federal court.

- The trial court violated Swearingen's constitutional rights by limiting impeachment evidence relating to Ms. Trotter's sexual history.

- Appellate counsel provided constitutionally inadequate representation by failing to challenge the admissibility of statements Swearingen made to police officers.

- Appellate counsel failed to advance claims relating to the police searches and seizures that resulted in the introduction of incriminating evidence at trial.

- Trial counsel's cross-examination of expert witnesses regarding evidence linking Swearingen to Ms. Trotter's murder failed to meet constitutional expectations.

Respondent moves for summary judgment.  Respondent contends that Swearingen failed to exhaust most of his federal claims in state court.  Respondent also argues that the application of the AEDPA's deferential standard of review prevents this Court from granting federal habeas relief.[3]

## STANDARD OF REVIEW

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991); *see also* 28 U.S.C. § 2254(a) (permitting habeas relief only "on the ground that [a petitioner] is in custody in violation of the Constitution or laws and treaties of the United States"). Therefore, "[t]he role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited." *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983); *see*

---

[3]     Swearingen's response to the summary judgment motion concedes that "Respondent presents cogent arguments against the first, fourth, fifth, and sixth claims for relief[.]" (Instrument No, 29 at 1).  While Swearingen's response does not refute Respondent's summary judgment arguments, he still has not formally abandoned those claims.  This Court, therefore, will briefly address their merits.

*also Engle v. Isaac*, 456 U.S. 107, 127 (1982) ("The States possess primary authority for defining and enforcing the criminal law. In criminal trials they also hold the initial responsibility for vindicating constitutional rights. Federal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights."). Important interests of finality, comity, and federalism circumscribe the scope of federal habeas review because "[l]iberal allowance of the writ . . . degrades the prominence of the trial itself." *Isaac*, 456 U.S. at 128. "[F]ew indeed is the number of state prisoners who eventually win their freedom by means of federal habeas corpus. Those few who are ultimately successful are persons whom society has grievously wronged and for whom belated liberation is little enough compensation." *Fay v. Noia*, 372 U.S. 391, 440-41 (1963). Thus, "the writ of habeas corpus has historically been regarded as an extraordinary remedy, a bulwark against convictions that violate fundamental fairness." *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993) (quotation omitted); *see also Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment) (stating that "habeas corpus is not intended as a substitute for appeal, nor as a device for reviewing the merits of guilt determinations at criminal trials[,] but it is designed to guard against extreme malfunctions in the state criminal justice systems").

The AEDPA governs and guides federal review of Swearingen's habeas petition. Congress enacted the AEDPA "at least in part, to ensure comity, finality, and deference to state court habeas determinations by limiting the scope of collateral review and raising the standard for federal habeas relief." *Robertson v. Cain*, 324 F.3d 297, 306 (5th Cir. 2003); *see also Williams v. Taylor*, 529 U.S. 420, 436 (2000) (noting the "AEDPA's purpose to further the principles of comity, finality, and federalism"). Under the AEDPA, a federal court can only grant relief if a state court's

adjudication of a constitutional claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  "A state-court decision is contrary to [the Supreme Court's] clearly established precedents if it applies a rule that contradicts the governing law set forth in [its] cases, or if it confronts a set of facts that is materially indistinguishable from [a Supreme Court decision] but reaches a different result."  *Brown v. Payton*, ___ U.S. ___, 125 S. Ct. 1432, 1438 (2005); *see also Williams v. Taylor*, 529 U.S. 362, 405-406 (2000); *Price v. Vincent*, 538 U.S. 634, 640 (2003); *Early v. Packer*, 537 U.S. 3, 7-8 (2002).  A state court unreasonably applies federal law "if the state court applies [Supreme Court] precedents to the facts in an objectively unreasonable manner."  *Payton*, ___ U.S. at ___, 125 S. Ct. at 1438; *see also Williams*, 529 U.S. at 407.

The AEDPA also controls federal review of factual issues raised by a habeas petitioner.  The AEDPA "overrides the ordinary rule that, in a summary judgment proceeding, all disputed facts must be construed in the light most favorable to the nonmoving party."  *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002), *cert. dismissed*, 541 U.S. 913 (2003).  A federal habeas court must presume any underlying state factual findings to be correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003); *Smith*, 311 F.3d at 668.  Under 28 U.S.C. § 2254(d)(2), "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented."  *Miller-El*, 537 U.S. at 340.

Notwithstanding a petitioner's compliance with 28 U.S.C. § 2254(d)(1) and (2), no Supreme Court case "ha[s] suggested that a writ of habeas corpus should automatically issue if a

6

prisoner satisfies the AEDPA standard[.]"  *Horn v. Banks*, 536 U.S. 266, 272 (2002); *see also*

*Robertson v. Cain*, 324 F.3d 297, 306 (5th Cir. 2003) (finding that 28 U.S.C. § 2254(d) "does not

require federal habeas courts to grant relief reflexively").  A habeas corpus petitioner meeting his

burden under 28 U.S.C. § 2254(d) must still comply with jurisprudential tenets, such as the

harmless-error doctrine and the non-retroactivity principle, that bridle federal habeas review.  *See*

*Thacker v. Dretke*, 396 F.3d 607, 612 n.2 (5th Cir. 2005).  Accordingly, any trial error cannot form

the basis for federal habeas relief unless it "ha[d] a 'substantial and injurious effect or influence in

determining the jury's verdict.'"  *Robertson*, 324 F.3d at 304 (quoting *Brecht*, 507 U.S. at 629); *see*

*also Aleman v. Sternes*, 320 F.3d 687, 690-91 (7th Cir.) ("Nothing in the AEDPA suggests that it

is appropriate to issue writs of habeas corpus even though any error of federal law that may have

occurred did not affect the outcome."), *cert. denied*, 539 U.S. 960 (2003).  A habeas court likewise

cannot grant relief if it would require the creation of new constitutional law.  *See Banks*, 536 U.S.

at 272; *Teague v. Lane*, 489 U.S. 288 (1989).[4]

## ANALYSIS

### I.    Unexhausted Claims

---

[4]    Federal habeas relief generally may not be premised on "a new rule" of law if the
Supreme Court announced that rule after the petitioner's conviction became "final," if the petitioner
wishes to establish a wholly new rule, or if the petitioner seeks to apply settled precedent in a novel
way that would result in the creation of a new rule.  *See Teague*, 489 U.S. at 310; *Penry v. Lynaugh*,
492 U.S. 302, 313 (1989) (finding *Teague* applicable in the capital context).  "[A] case announces
a new rule when it breaks new ground or imposes a new obligation on the States or the Federal
government. . . . To put it differently, a case announces a new rule if the result was not *dictated* by
precedent existing at the time the defendant's conviction became final." *Teague*, 489 U.S. at 301;
*see also Graham v. Collins*, 506 U.S. 461, 467 (1993). As a general rule, "if the State . . . argue[s]
that the defendant seeks the benefit of a new rule of constitutional law, the court *must* apply *Teague*
before considering the merits of the claim . . . ." *Caspari v. Bohlen*, 510 U.S. 383, 389 (1994); *see
also Banks*, 536 U.S. at 272 ("[A] federal court considering a habeas petition must conduct a
threshold *Teague* analysis when the issue is properly raised by the state.").

Swearingen failed to give the state courts an opportunity to consider several of the issues he now raises on federal habeas review.  For the first time in this forum, Swearingen raises the following claims: (1) the trial court violated Swearingen's constitutional rights by limiting evidence relating to Ms. Trotter's sexual history; (2) appellate counsel provided constitutionally inadequate representation by failing to challenge the admissibility of statements Swearingen made to police officers; (3) appellate counsel rendered ineffective assistance by failing to challenge police searches and seizures that uncovered incriminating evidence; and (4) trial counsel's cross-examination of some expert witnesses failed to comply with professional standards.[5]  Respondent argues that the unexhausted nature of these new claims prevents federal review of their merits.

With inapplicable statutory exceptions, the AEDPA prevents this Court from granting habeas relief "unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State[.]"  28 U.S.C. § 2254(b).  Swearingen failed to raise his four new claims in state court.  Respondent contends that, because Texas' stringent abuse-of-the-writ doctrine would prevent Swearingen from litigating those claims in a new state habeas application, procedural law forecloses federal consideration of their merits.  Respondent correctly recognizes that "[a] procedural default . . . occurs when a prisoner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'"  *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997) (quoting *Coleman v. Thompson*, 501 U.S. 722, 734 n.1 (1991)), *cert. denied*, 523 U.S. 1139 (1998); *see also Steele v. Young*, 11 F.3d 1518, 1524 (10th Cir. 1993) (holding that when "it is obvious that

---

[5]     Respondent also argues that Swearingen failed to exhaust his jury-selection claim because he never relied on the federal constitution when advancing that claim on direct review.  The Court will discuss the unexhausted nature of that claim separately.

the unexhausted claim would be procedurally barred in state court, we will forego the needless 'judicial ping-pong' and hold the claim procedurally barred from habeas review").  Article 11.071 § 5(a) of the Texas Code of Criminal Procedure, which generally prohibits a Texas court from considering a successive habeas application on the merits, would force dismissal of any state habeas action based on Swearingen's new claims.  As Article 11.071 is an adequate state procedural bar, both strictly and regularly enforced by the state courts, *see Barrientes v. Johnson*, 221 F.3d 741, 759 (5th Cir. 2000), *cert. dismissed*, 531 U.S. 1134 (2001); *Muniz v. Johnson*, 132 F.3d 214, 221 (5th Cir.), *cert. denied*, 523 U.S. 1113 (1998), this Court must respect Texas' traditional use of its abuse-of-the-writ doctrine.  Procedural law impedes federal consideration of Swearingen's four new claims.

A procedural default is not insuperable.  A federal petitioner may overcome the procedural default of his claims after he makes an adequate showing of cause and prejudice:

> [i]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate *cause* for the default and *actual prejudice* as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman*, 501 U.S. at 750 (emphasis added).  Swearingen provides no justification for his failure to raise the claims relating to the trial court's limitation on evidence or trial counsel's cross-examination of witnesses.  Those claims are unquestionably procedurally barred.

As cause for his failure to raise his ineffective-assistance-of-appellate-counsel claims, Swearingen alleges that the state habeas court thwarted his attempt to pursue those claims on habeas review.  Recognizing that the Supreme Court requires a petitioner not only to exhaust his substantive claims, but also any allegations used to overcome a procedural bar, *see Edwards v. Carpenter*, 529

U.S. 446, 453 (2000), Swearingen argues that it would have been futile to raise his ineffective-assistance-of-appellate-counsel-as-cause claim earlier.  According to Swearingen, the state habeas court would not have entertained any ineffective-assistance-of-appellate-counsel claims on state habeas review because, pursuant to Texas procedure, he filed his state habeas application during the pendency of his direct review.  Swearingen alleges that the state habeas court would have dismissed any challenge to appellate counsel's representation as premature.

Swearingen does not point to any Texas case or procedure explicitly preventing a habeas court from considering claims of ineffective assistance arising in a concurrently filed appeal.  To be sure, Swearingen identifies several difficulties with Texas' procedure that would require a trial-level court to consider an appellate attorney's representation before the finality of direct appellate review.  Nonetheless, Swearingen does not point to any case, much less his own proceedings, in which the Court of Criminal Appeals has exempted ineffective-assistance-of-appellate-counsel claims from an applicant's initial habeas proceedings.  Swearingen only surmises that, by denying a request he made for forensic testing, the state habeas court signaled that it would not consider any ineffective-assistance-of-appellate-counsel arguments, thus making futile any attempt to raise such claims.  Swearingen fails to recognize that he based his forensic testing request on claims separate and distinct from his present ineffective-assistance-of-appellate-counsel claims.  The record provides no hint that the state habeas court intended to chill the presentation of his specific allegations against appellate counsel by denying investigative funding.  Swearingen's mere suspicion fails to prove an unwillingness on the state habeas court's part to resolve important constitutional issues relating to his appeal.  Most likely, Swearingen only recently anticipated the presentation of these unexhausted claims and now seeks a means by which he may dodge the

obvious procedural hurdles to federal review.  Swearingen's speculative argument that the state

habeas court thwarted his presentation of ineffective-assistance-of-appellate-counsel claims cannot

forgive his failure to advance the challenged claims in state court.

Swearingen failed to exhaust those allegations he uses as cause to overcome the

impending procedural bar of his unexhausted arguments.  Adequate and independent state

procedural law bars federal consideration of the merits of Swearingen's four unexhausted claims.

## II.    The Trial Court's Refusal to Excuse Three Jurors for Cause

On direct review, Swearingen claimed that the trial court improperly denied his

challenges for cause against prospective jurors Jeffery Hollier, Doreen Sipe, and Wayne Lightfoot.

The Court of Criminal Appeals found that the trial court properly denied each challenge for cause.

*Swearingen*, 101 S.W.2d at 98-100.  Swearingen renews these claims on federal review, asserting

that the trial court's denial of his challenges violated the Sixth and Fourteenth Amendments.

Respondent raises procedural defenses and also attacks the merits of Swearingen's claims.

A.    Exhaustion of Remedies

Respondent contends that Swearingen's state claim relied on state law without

reference to the federal constitution.  Swearingen unquestionably raised related jury-selection claims

in the direct appeal from his conviction and sentence.  There, Swearingen similarly challenged the

trial court's refusal to dismiss potential jurors Hollier, Sipe, and Lightfoot, though in doing so he

only cited state law.  Swearingen referenced no federal law or constitutional provision.  Respondent

argues that Swearingen's failure to cite federal law on direct appeal renders his present jury-

selection claims unexhausted and, consequently, procedurally barred.

The exhaustion doctrine's exacting requirements force an inmate to seek relief in the

11

state courts before availing himself of federal review.  A habeas petitioner only satisfies the exhaustion requirement when he fairly presents the *substance* of his federal claim to the highest state court, *see Mercadel v. Cain*, 179 F.3d 271, 275 (5th Cir. 1999); *Nobles*, 127 F.3d at 420, giving the state courts "a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim." *Anderson v. Harless*, 459 U.S. 4, 6 (1983) (quoting *Picard v. Connor*, 404 U.S. 270, 276-77 (1971)).  While "[t]he habeas applicant need not spell out each syllable of the claim before the state court to satisfy the exhaustion requirement," legal theories or factual development that stray from the issues presented in state court may render a claim unexhausted.  *See Fisher v. Texas*, 169 F.3d 295, 302 (5th Cir. 1999); *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998); *Burns v. Estelle*, 695 F.2d 847, 849 (5th Cir. 1983).  Federal courts only consider issues that do not "*fundamentally alter*[] the claim presented to the state courts." *Anderson v. Johnson*, 338 F.3d 382, 387 n.8 (5th Cir. 2003).

A petitioner cannot avoid the exhaustion doctrine by pointing to a somewhat-similar claim he raised in state court that only relied on state law.  *See Harless*, 459 U.S. at 6 ("It is not enough . . . that a somewhat similar state-law claim was made."); *Brown v. Dretke*, ___ F. 3d ___, 2005 WL 1793347, at *3 (5th Cir. July 29, 2005) (finding no exhaustion when a petitioner did not cite federal law or "discuss any federal case law in support of his complaint"); *cf. Salazar v. Dretke*, ___ F.3d ___, 2005 WL 1797079 n.24, at * 9 (5th Cir. July 29, 2005) (finding, for the purposes of the AEDPA's adjudication-on-the-merits precursor to legal deference, that "some support exists for the . . . position that a state court's adjudication of a state law claim that is similar to a federal constitutional claim may constitute an adjudication on the merits under § 2254(d)").  Here, Swearingen did not give the Court of Criminal Appeals an opportunity to consider the *federal*

constitutional implications of the trial court's actions.  Swearingen easily could have complied with his obligation under the exhaustion doctrine by simply mentioning the federal constitution.  *See Baldwin v. Reese*, 541 U.S. 27, 32 (2004) ("A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'").  Swearingen, however, gave the Court of Criminal Appeals no indication that he relied on federal constitutional arguments in his direct appeal.

"If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution."  *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995).  Swearingen's state-court filing failed to make clear his reliance on a federal ground for relief.  *See Reese*, 541 U.S. at 32 (finding that a "state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief [or a similar document] that does not alert it to the presence of a federal claim").  Swearingen's failure to alert the state courts to a federal constitutional claim renders his new reliance on the federal constitution claim unexhausted.

Because the Court of Criminal Appeals has already considered Swearingen's jury-selection claim under state law, it is not likely that the state courts would consider the federal permutations in a successive habeas application.  A state court considering Swearingen's unexhausted claim on a successive habeas application would assuredly find that Texas' abuse-of-the-writ doctrine prevented consideration of that claim.  As Swearingen completely failed to raise his federal arguments in state court, and Texas would find any belated attempt to raise them an abuse

13

of the writ, procedural law bars federal consideration of its merits.  Swearingen makes no effort to excuse his failure to exhaust the federal basis for the instant claim.  Independent and adequate state procedural law bars federal consideration of Swearingen's jury-selection claim.

Insofar as the exhausted portion of Swearingen's claim relies only on state law, the AEDPA only authorizes habeas relief arising from claims involving the "Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); *see also McGuire*, 502 U.S. at 67-68 ("We have stated many times that federal habeas corpus relief does not lie for errors of state law."); *Narvaiz v. Johnson*, 134 F.3d 688, 695 (5th Cir. 1998) (holding that "claims that the trial court improperly applied state law do not constitute an independent basis for federal habeas relief"), *cert. denied*, 524 U.S. 947 (1998).  This Court denies Swearingen's jury-selection claims insofar as he relies on state law.

Alternatively, the Court will briefly review the merits of Swearingen's unexhausted federal constitutional claims.  *See* 28 U.S.C. § 2254 (b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

B.    Sixth Amendment

Swearingen claims that the denial of the challenges for cause against potential jurors Hollier, Sipe, and Lightfoot violated both his Sixth Amendment right to an impartial jury and the due process clause.  After the trial court refused to remove the three jurors for cause, Swearingen used a peremptory strike to excuse each challenged juror from the panel.  Those jurors, therefore, were "removed from the jury as effectively as if the trial court had excused [them] for cause."  *Ross v. Oklahoma*, 487 U.S. 81, 86 (1988).  Any Sixth Amendment inquiry, therefore, "must focus not

14

on [the juror who was peremptorily dismissed], but on the jurors who ultimately sat." *Id.* at 85*; see also United States v. Webster*, 162 F.3d 308, 342 n.36 (5th Cir. 1998) ("The failure properly to grant a challenge for cause rises to the level of a constitutional violation and warrants reversal only 'if the defendant exhausts all peremptory challenges and an incompetent juror is forced upon him.' Absent such a showing, the defendant has not been denied his Sixth Amendment right to an impartial jury."), *cert. denied*, 528 U.S. 829 (1999).

Swearingen's federal petition does not challenge the impartiality of any juror who sat at trial.[6] Swearingen does not "suggest that the actual jury that determined his guilt and penalty was not impartial." *Jones v. Dretke*, 375 F.3d 352, 356 (5th Cir. 2004), *cert. denied*, ___ U.S. ___, 125 S. Ct. 878 (2005). Swearingen removed by peremptory challenge each prospective juror which

---

[6]     When Swearingen raised this claim on direct review he alleged that the expenditure of peremptory challenges to remedy the trial court's rulings forced him to accept "an objectionable juror," Connie Taylor. Swearingen, however, only labeled Ms. Taylor "objectionable" without providing any basis to question her impartiality. *Ross* explicitly refers to a constitutional violation occurring only when the jury that sits is not "impartial." 487 U.S. at 88. Courts have recognized that *Ross* does not establish a low threshold for demonstrating a constitutional violation; to grant relief courts have found that the juror for which a petitioner would have expended a peremptory challenge must not be "impartial," that is, the juror would be "subject to removal for cause." *Nethery v. Collins*, 993 F.2d 1154, 1161 n.20 (5th Cir. 1993), *cert. denied*, 511 U.S. 1026 (1994); *see also United States v. Martinez-Salazar*, 528 U.S. 304, 316 (2000) (finding that error under *Ross* results when a court seats "any juror who should have been dismissed for cause"); *Webster*, 162 F.3d at 341 (distinguishing between an objectionable and impartial juror); *Nichols*, 69 F.3d at 1287 (focusing on the impartiality of jurors). In Texas, an "objectionable" juror is simply one subject to peremptory challenge. *See Wolfe v. State*, 178 S.W.2d 274, 281 (Tex. Crim. App. 1944). Therefore, this Court's focus "beings and ends" with a determination of whether Juror Taylor possessed "'views [that] would prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath.'" *Hall*, 152 F.3d at 407 (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)). Swearingen has made no effort to meet that exacting standard. Even at trial, Swearingen never challenged Ms. Taylor for cause, he merely asked the trial court to grant him an additional peremptory challenge and then listed several reasons for which he found her objectionable, none of which requires a dismissal for cause. Swearingen fails to point to any juror whom the trial court should have removed for cause.

he now alleges that the trial court should have excused for cause, "which is fatal to his claim that his right to an impartial jury was violated." *Soria v. Johnson*, 207 F.3d 232, 244 (5th Cir.), *cert. denied*, 530 U.S. 1286 (2000). Swearingen's Sixth Amendment claim, therefore, fails under *Ross*.

    C.      Due Process Violation

                Apart from his Sixth Amendment claim, Swearingen asserts that actions of the trial court during jury selection violated his due process rights under the Fourteenth Amendment. Swearingen does not clarify the nature of his due process argument. Nevertheless, the fact that Swearingen used his peremptory strikes to remove challenged jurors does not give rise to a due process violation. In *United States v. Martinez-Salazar*, 528 U.S. 304 (2000), the Supreme Court refused to recognize a due process violation occasioned by the curative use of peremptory challenges.[7] The *Martinez-Salazar* Court recognized that a defendant presented with unfavorable jury-selection determinations faces a difficult choice: "After objecting to the [trial court's] denial of his for-cause challenge, [a defendant has] the option of letting [the objectionable potential juror] sit on the petit jury and, upon conviction, purs[ue] a Sixth Amendment challenge on appeal." *Id.* at 314. Instead of "taking his chances on appeal," any defendant who uses his peremptory strikes to remove a challenged juror "use[s] the challenge in line with a principal reason for peremptoriness: to help secure the constitutional guarantee of trial by an impartial jury," a decision that "comports with the reality of the jury selection process." *Id.* at 316. The deprivation (by choice) of that peremptory challenge, therefore, does not violate due process principles.

---

       [7]     *Martinez-Salazar* was a federal case brought under the Fifth Amendment's due process clause. There is no material distinction that would prevent this Court from applying *Martinez-Salazar*'s holding in this 28 U.S.C. § 2254 case brought under the Fourteenth Amendment's due process clause.

Under *Martinez-Salazar*'s reasoning, the trial court never "compell[ed] use of a peremptory." (Instrument No. 21 at 9). Swearingen strategically chose to use a peremptory rather than seeking an appellate remedy for the perceived error. The Supreme Court has not found that a due process violation occurs when circumstances present the difficult choice faced by Swearingen. As no "clearly established Federal law" requires habeas relief in such circumstances, this Court must deny relief on Swearingen's jury-selection claim.[8]

## III.   Legal Sufficiency of the Evidence Supporting the Underlying Kidnapping or Aggravated Sexual Assault

Swearingen claims that the trial evidence insufficiently supported his capital-murder conviction. In this case, the indictment charged and the jury instructions authorized a death-eligible conviction only after the jury found that Swearingen murdered Ms. Trotter during an actual or attempted kidnapping or sexual assault. Swearingen's federal petition sharply challenges the factual scenario underlying his conviction, attacking the prosecution's theory that he kidnapped, sexually assaulted, and murdered Ms. Trotter. While Swearingen vigorously disputes the evidence showing that he killed Ms. Trotter,[9] his state-court proceedings never questioned the integrity of the evidence establishing his identity as Ms. Trotter's murderer. Swearingen only disputed the commission of predicate acts making his a death-eligible offense. To the extent that Swearingen now challenges

---

[8]     The Court would note that it has reviewed the record with respect to potential jurors Hollier, Sipe, and Lightfoot. The Court of Criminal Appeals found on direct review that the trial court did not err in denying the challenge for cause against each of those potential jurors. *Swearingen*, 101 S.W.2d at 98-100. "A state trial court's refusal of a petitioner's challenge for cause is a factual finding entitled to a presumption of correctness." *Soria*, 207 F.3d at 242. From this Court's review of their *voir dire*, the Court concludes that the record supports the trial court's determination with respect to each potential juror. *See* 28 U.S.C. § 2254(d)(2).

[9]     For instance, Swearingen points to difficulties in the time frame in which the killing occurred as exculpating him of Ms. Trotter's murder.

17

the trial evidence showing his commission of Ms. Trotter's murder, such arguments have little relevance to the claims he exhausted in state court.

Swearingen's exhausted federal claim asserts that the evidence insufficiently supported the jury's finding of the predicate offenses that elevated his crime to a capital offense, making him eligible, at the most, for a conviction under the lesser-included offense of murder. This Court cannot reconsider whether Swearingen murdered Ms. Trotter. The Court can, however, review whether sufficient evidence warranted a capital conviction.

A.    Clearly Established Federal Law Governing Insufficiency-of-the-Evidence Claims

"[T]he Due Process Clause of the Fourteenth Amendment forbids a State to convict a person of a crime without proving the elements of that crime beyond a reasonable doubt." *Fiore v. White*, 531 U.S. 225, 228-29 (2001); *see also In re Winship*, 397 U.S. 358, 364 (1970). "This reasonable-doubt standard plays a vital role in the American scheme of criminal procedure . . . [as] a prime instrument for reducing the risk of convictions resting on factual error." *Cage v. Louisiana*, 498 U.S. 39, 39-40 (1990) (quotation omitted). The jurisprudence flowing from *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), effectuates the reasonable-doubt inquiry by asking whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Wright v. West*, 505 U.S. 277, 283-84 (1992) (quotation omitted); *see also Pilon v. Bordenkircher*, 444 U.S. 1, 2 (1979).

When reviewing an insufficiency-of-the-evidence claim, a court cannot "make its own subjective determination of guilt or innocence." *Jackson*, 443 U.S. at 320 n. 13. The *Jackson* inquiry

> does not require a court to 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' Instead, the relevant question is

18

whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson*, 443 U.S. at 318-319 (quotations and citations omitted; emphasis in original); *see also*

*Herrera v. Collins*, 506 U.S. 390, 401-402 (1993) (noting that the *Jackson* standard asks "whether

[the jury] made a rational decision to convict or acquit").  Thus, this Court focuses not on "whether

the jury correctly determined guilt or innocence, but whether the jury made a rational decision."

*United States v. Partida*, 385 F.3d 546, 560 (5th Cir. 2004), *cert. denied*, ___ U.S. ___, 125 S. Ct.

1616 (2005).

The *Jackson* inquiry does not ask whether the facts could have supported a theory

leading to the defendant's acquittal.  *See United States v. Hicks*, 389 F.3d 514, 533 (5th Cir. 2004)

("To be sufficient, the evidence need not exclude every reasonable hypothesis of innocence, so long

as the totality of the evidence permits a conclusion of guilt beyond a reasonable doubt.").  Nor does

*Jackson* require the evidence to be "wholly inconsistent with every conclusion except that of

guilt[.]" *United States v. Vasquez*, 953 F.2d 176, 180 (5th Cir.), *cert. denied*, 504 U.S. 946 (1992).

"[A] federal habeas corpus court faced with a record of historical facts that supports conflicting

inferences must presume – even if it does not affirmatively appear in the record – that the trier of

fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."

*Jackson*, 443 U.S. at 326; *see also United States v. Lopez*, 979 F.2d 1024, 1028 (5th Cir. 1992)

("[W]hether dealing with testimonial or circumstantial evidence, the test for sufficiency is whether

the jury could reasonably, logically, and legally infer that the defendant was guilty beyond a

reasonable doubt."), *cert. denied*, 508 U.S. 913 (1993).

The Court of Criminal Appeals considered Swearingen's insufficiency-of-the-evidence arguments on direct review.  The Court of Criminal Appeals cited *Jackson*'s deferential review and found that the trial evidence sufficiently supported Swearingen's capital-murder conviction.  This Court must determine whether that adjudication was contrary to, or an unreasonable application of, the Supreme Court's *Jackson* jurisprudence.  *See* 28 U.S.C. § 2254(d)(1) [10]

B.      Factual Background

On direct review, the trial court exhaustively reviewed the factual scenario that inculpated Swearingen in Ms. Trotter's death.  This Court will excerpt the state court's factual analysis below:

> The evidence, viewed in the light most favorable to the State, shows that Swearingen became acquainted with Trotter on Sunday, December 6, 1998, talked with her at length, got her phone number, and made plans to see or talk with her again the next day.  The next day, she failed to show up for lunch after Swearingen had bragged to his coworkers about his plans to have lunch with Trotter.  His coworkers teased him about being stood up even after he had told them that he called Trotter and she said that she had been taking a test. Swearingen appeared to be angry the remainder of the

_____

[10]      The Fifth Circuit has not decided whether a *Jackson* claim involves a question of fact or a question of law, and therefore whether 28 U.S.C. § 2254(d)(1) or § 2254(d)(2) applies.  Several circuits have determined that a sufficiency-of-the-evidence claim is a legal determination that federal courts must review under 2254(d)(1).  *See Ponnapula v. Spitzer*, 297 F.3d 172, 180 (2d Cir. 2002); *Sanford v. Yukins*, 288 F.3d 855, 863 (6th Cir. 2002); *Piaskowski v. Bett*, 256 F.3d 687, 691 (7th Cir. 2001); *Hurtado v. Tucker*, 245 F.3d 7, 16 (1st Cir.), *cert. denied*, 534 U.S. 925 (2001).  The question remains open in at least two circuits.  *See Turrentine v. Mullin*, 390 F.3d 1181, 1197 (10th Cir. 2004), *cert. denied*, ___ U.S. ___, 125 S. Ct. 2544 (2005); *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir.), *cert. denied*, ___ U.S. ___, 125 S. Ct. 415 (2004).  The Fifth Circuit has not addressed the issue, but traditionally adjudicates *Jackson* claims under subsection (d)(1).  *See Williams v. Puckett*, 283 F.3d 272, 278 (5th Cir.), *cert. denied*, 537 U.S. 1010 (2002); *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001), *cert. denied*, 535 U.S. 982 (2002); *Martinez v. Johnson*, 255 F.3d 229, 244-45 (5th Cir. 2001), *cert. denied*, 534 U.S. 1163 (2002).  This Court, therefore, will apply 28 U.S.C. § 2254(d)(1) to Swearingen's *Jackson* claim.

day.

Later that evening, while using his truck to help transport some furniture, Swearingen commented to Bryan Foster and William Brown that he was going to meet a young lady named Melissa for lunch the next day, and if everything went right, he was going "to have Melissa for lunch." Brown noticed various items of clothing in the backseat of Swearingen's truck. Swearingen called Trotter from Foster's house and talked about meeting for lunch and helping her study for an exam.

On Tuesday, December 8, Swearingen met Trotter in the college library around 1:30 p.m., after Trotter had purchased some tater-tots from the school cafeteria. After sitting by the computers and talking amicably with Swearingen for some amount of time, Trotter left the library with Swearingen around 2 p.m. Trotter's vehicle remained in the college parking lot.

At 2:05 p.m., Swearingen returned a page he received and said he would have to call back later because he was at lunch with a friend.

Swearingen returned to his trailer sometime before 3:30 p.m. and left between 2:00 p.m. and 3:30 p.m., then returned again to the trailer sometime before 5:30 p.m., asked his landlord some questions, then left again between 4:30 p.m. and 5:30 p.m., to pick up his wife, Terry Swearingen, from his mother's house. His neighbor, seeing Swearingen's truck come and go, was not able to see through the tinted windows or see who got in and out of the truck.

When Swearingen and his wife returned home, a package of Marlboro Light cigarettes and a red lighter were on top of the television. The evidence showed that Trotter smoked Marlboro Lights and that neither appellant or his wife smoked.

That evening, Swearingen called Phyllis Morrison, a former girlfriend, and told her that he was in trouble and the police might be after him.

On December 11, Swearingen was arrested pursuant to several outstanding warrants, and while being handcuffed, said that his wrist and ribs were sore from a bar fight he had been in the week before.

Trotter's body was found in the Sam Houston National Forest on January 2, 1999, with a piece of hosiery still tied, as a ligature, around her neck. The state of the body's decomposition was consistent with having been in the woods approximately 25 days, supporting December 8 as the date of death. The location where Trotter's body was found was heavily wooded, secluded, and remote. The police had previously searched the area three times without finding the body. One had to be within twenty feet of the body before seeing it. Swearingen knew his way around this area; he had driven a date around the vicinity a few months earlier in his red

pickup.

Trotter's body was on its back in a pile of bushes, her right arm was above her head and slightly to the left.  Her top and bra were pulled up under her arms, exposing her breasts and back.  There were creases on her back from her neck to her waist that could have been caused by laying on the debris in the bushes for a period of time after she had died.  Her jeans were on and the fly was closed, but the right rear pocket was torn downwards exposing part of her buttocks.  She was wearing red underwear.  There were no scratches found on her exposed skin as one would expect to find if she had been dragged to the location.  However, there was no soil on Trotter's shoes.  She had only one shoe on; the other shoe was lying nearby.

Trotter died from asphyxia, lack of oxygen, by ligature strangulation.  The nylon ligature was a section cut from a pair of pantyhose; the matching complementary portion of the pantyhose was found in Swearingen's trailer. There also appeared to be a sharp-forced injury on Trotter's neck that would have been inflicted before Trotter died, while her blood continued to circulate. Although there was subsequent animal activity and tooth marks on the neck organs at that area, a cut with a sharp object, like a knife, could not be ruled out.

The lack of defensive wounds, such as broken fingernails, and the difficulty of tying an elastic piece of nylon around a struggling victim, suggested that Trotter may have been unconscious when the ligature was applied.   Although the state of decomposition made it difficult to determine, the left side of Trotter's face was much darker and at a more advanced stage of decomposition, which could be consistent with having sustained a bruise on the left side of her face.  Evidence showed that animals are drawn to blood and a bruise would collect blood close to the skin's surface.  There was also a deep bruise on Trotter's tongue, like a bite or a cut, consistent both with being struck under the chin, which would push the lower jaw up onto the tongue, and with biting down on the tongue while being strangled or suffering a seizure.  There was also discoloration on Trotter's vaginal wall, a bruise that could have been caused by sexual intercourse on the day of her disappearance.

There were fibers found on Trotter similar to fibers from Swearingen's jacket, others similar to the seat and head-liner in Swearingen's truck, and others similar to the carpet in Swearingen's master bedroom.   There were also fibers found in Swearingen's truck that were similar to fibers from Trotter's jacket.  There were hairs in Swearingen's truck that appeared to have been forcibly removed from Trotter's head.

An internal examination revealed that Trotter's stomach contained not only what appeared to be a form of potato, but also what appeared to be chicken and a small amount of greenish vegetable material.

While in jail awaiting trial, Swearingen sent a letter to his mother that the evidence showed Swearingen had written, with the help of an English-Spanish dictionary and had his cellmate copy.  The letter stated it was written by a girl named Robin who could identify Trotter's murderer as someone other than Swearingen and who knew the details of the murder.  The translation of the letter is as follows:

> Larry
>
> I have information that I need to tell you about Melissa and Wanda. I was with the murderer of Melissa, and with the one that took Wanda from work.  I am not sure what he did with Wanda, but I saw everything that happened to Melissa.  He was talking to her in the parking lot.  They went to school together is what he told me.  "We drove for awhile, and then we went and had breakfast.  I began to talk about sex when she said she had to go home."  He hit her in the left eye, and she fell to the floor of her car.  He took her to the wood and began to choke her with his hands at first, then he jerked (jalar is slang) her to the bushes.  He cut her throat to make sure that she was dead. Her shoe came off when he jerked (slang) her into the bushes. Her jabear (cannot make out no such word in Spanish) was torn. I am in love with him, and I don't want him in jail.  The man in jail doesn't deserve to be in jail, either.  To make sure that you know, I am telling you the truth.  She was wearing red panties when R.D. murdered her.  He choked her with his hands first, but he used A piece of rope the truck from his truck; he had a piece of black rope that he used in his boat to anchor it, or something, he said.  When he dragged her from the car, he put her in the shrub on her back.  I know that I should turn him in, but he told me that he would kill me, too, and I believe him.  He has told about this murder to 3 other women in the past, will tell you that he smokes, and he smoked with her at the college at 2:30 and drove a blue truck.  His hair is blonde and brown and lives here. His name is Ronnie, but that is all I can tell, if you want more information, say it on paper and I will continue to write, but I want to come in.
>
> Robin

*Swearingen*, 101 S.W.3d at 92-95.[11]

---

[11]      Swearingen relies on extra-record facts to bolster his insufficiency-of-the-evidence claim.  This Court's sufficiency review only extends to testimony and evidence presented at trial. *See Herrera*, 506 U.S. at 402 ("[T]he sufficiency of the evidence review authorized by *Jackson* is

(continued...)

Based on the above-stated facts, the trial court's instructions allowed the jury to convict Swearingen of capital murder if he killed Ms. Trotter during the course of, or during an attempt to commit, a kidnapping or aggravated sexual assault.  Clerk's Record Vol. 20 at 2874.  The trial court described "[i]n the course of committing" as "conduct that occurs in the course of committing, in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of an offense."  Clerk's Record Vol. 20 at 2875-76.  The trial court explained that an "attempt" occurred when "with specific intent to commit an offense, a person does an act amounting to more than preparation that tends, but fails, to effect the commission of the offense intended."  Clerks's Record Vol. 20 at 2876.  The instructions required the jury to find "each and every element of the offense charged beyond a reasonable doubt."  Clerk's Record Vol. 20 at 2880. The trial court also instructed the jury on the lesser-included offense of murder and informed the jury that they should resolve any doubt concerning whether he committed capital murder in favor of the lesser offense.  Clerk's Record Vol. 20 at 2877.  The Court will review the Court of Criminal Appeals' finding that a rational jury could conclude that Swearingen committed a death-eligible offense.

Before turning to the evidence supporting Swearingen's capital-murder conviction, this Court notes that the prosecution presented a circumstantial, and largely inferential, case.  While the trial evidence supported rather strongly a finding that Swearingen caused Ms. Trotter's death, the generally circumstantial evidence became less convincing with respect to the predicate offenses of kidnapping and aggravated sexual assault.  Viewed in isolation, the sketchy evidence did not

---

[11]      (...continued)
limited to 'record evidence.'  *Jackson* does not extend to nonrecord evidence, including newly discovered evidence." ).

irrefutably show that Swearingen killed Ms. Trotter during a completed or attempted kidnapping or sexual assault.  The Court of Criminal Appeals recognized that "[e]ach piece of evidence supporting the findings of kidnapping or sexual assault might appear weak and tentative when viewed in isolation, even in the light most favorable to the verdict," mainly because "[t]he forensic evidence was inconclusive, and in many cases the expert witnesses could not conclude that one explanation was more likely than not." *Swearingen*, 101 S.W.3d at 96.  Nevertheless, "the constancy and reasonable inferences drawn therefrom, provide the girders to strengthen the evidence and support a rational jury's finding the elements beyond a reasonable doubt." *Id.* at 97.  On that basis, the Court of Criminal Appeals found that "a rational jury would [not] have *necessarily* entertained a reasonable doubt regarding the aggravating elements of the offense." *Swearingen*, 101 S.W.3d at 96.

Notwithstanding the arguable weakness of some elements of the prosecution's case, and the fact that Swearingen presents alternative hypotheses on federal review that could exculpate him of any complicity in Ms. Trotter's murder, a *Jackson* review focuses on whether, when viewing the evidence in a manner most favorable to the prosecution, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. This Court reviews Swearingen's insufficient-evidence claim in the context of the AEDPA's two disjunctive means by which a petitioner may show entitlement to federal habeas relief: a petitioner must show that the state court's adjudication was either "contrary to" or an "unreasonable application of" federal law.  *See* 28 U.S.C. § 2254(d)(1).  Swearingen fails to meet either standard.

C.      "Contrary to . . . Clearly Established Federal Law"

On direct review, Swearingen challenged both the legal and factual sufficiency of the

25

evidence.  Under Texas law, an appellate court may engage in a *factual* sufficiency review, setting

aside the verdict "if it is so contrary to the overwhelming weight of the evidence as to be clearly

wrong and unjust."  *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996).  A *Clewis*

analysis often queries whether the evidence was "so obviously weak" that a jury would hold a

reasonable doubt as to the defendant's guilt.  *See Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App.

2002) ("[A] *Clewis* factual sufficiency review of the elements of a criminal offense asks whether a

neutral review of all the evidence, both for and against the finding, demonstrates that the proof of

guilt is so obviously weak as to undermine confidence in the jury's determination, or the proof of

guilt, although adequate if taken alone, is greatly outweighed by contrary proof.").   No

corresponding factual sufficiency claim exists under federal law.  *See Woods v. Cockrell*, 307 F.3d

353, 358 (5th Cir. 2002).  Swearingen faults the Court of Criminal Appeals' rejection of his claim

on direct review for interposing the state law *Clewis* standard to his federal *legal* insufficiency-of-

the-evidence claim.

       In this case, the Court of Criminal Appeals referred to  the Supreme Court's *Jackson*

standard before addressing Swearingen's sufficiency-of-the-evidence claim, laying out the correct

legal standard and citing relevant caselaw.   Swearingen maintains that the Court of Criminal

Appeals' conclusion, however, interjected Texas' factual insufficiency standard into the *Jackson*

review:

> While each piece of evidence lacked strength in isolation, the consistency of the
> evidence and the reasonable inferences drawn therefrom, provide the girders to
> strengthen the evidence and support a rational jury's finding the elements beyond a
> reasonable doubt.  We cannot say, looking at the totality of the evidence, *that the*
> *evidence was so obviously weak that a rational jury would have necessarily*
> *entertained a reasonable doubt* that appellant intended to have sexual intercourse
> with Trotter and that he attempted to do so despite her desire "to go home" when he
> started to talk about sex, or that he intended to restrain Trotter without her consent

and did so by moving her to a place where she was not likely to be found and continuing to confine her by using what turned out to be deadly force.

*Swearingen*, 101 S.W.3d at 96 (emphasis added).  Swearingen argues that, by conflating its federal constitutional analysis with state law, the Court of Criminal Appeals entered an opinion that was "contrary to" federal law.

A state-court decision is "contrary to [the Supreme Court's] clearly established precedents if it applies a rule that contradicts the governing law set forth in [Supreme Court] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme Court] but reaches a different result."  *Payton*, ___ U.S. at ___, 125 S. Ct. at 1438; *see also Bell v. Cone*, ___ U.S. ___, 125 S. Ct. 847, 851 (2005); *Vincent*, 538 U.S. at 639-40; *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003); *Williams*, 529 U.S. at 405.  Swearingen does not argue that his case is "materially indistinguishable" from any Supreme Court case.  Swearingen, however, argues that the Court of Criminal Appeals "applie[d] a rule that contradicts" the Supreme Court's "governing law." *Payton*, ___ U.S. at ___, 125 S. Ct. at 1432.

In reviewing the AEDPA's "contrary to" clause, a federal court must be mindful that "'state-court decisions be given the benefit of the doubt.'"  *Holland v. Jackson*, ___ U.S. ___,  124 S. Ct. 2736, 2739 (2004) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).  "'[R]eadiness to attribute error is inconsistent with the presumption that state courts know and follow the law.'" *Jackson*, ___ U.S. at ___,  124 S. Ct. at 2739 (quoting *Visciotti*, 537 U.S. at 24).  Therefore, a state court need not even rely on federal law "so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Packer*, 537 U.S. at 8; *see also Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) ("A state court's decision is not 'contrary to . . . clearly established Federal law' simply because the court did not cite our opinions.").  Habeas corpus law does not anticipate that

the state courts will apply the exact test, word for word, annunciated by the federal courts. Instead, the AEDPA only requires relief when the legal analysis by which the state courts adjudicated a criminal defendant's claim "contradict[ed]" Supreme Court governing law or "arrive[d] at a result different from" its binding precedent. *Williams*, 529 U.S. at 405-406; *see also Esparza*, 540 U.S. at 15-16.

Respondent takes great pains to construe the Court of Criminal Appeals' "so obviously weak" language as an analysis falling within the parameters of the *Jackson* inquiry. The Supreme Court has found that standards of review "focus[ing] on 'passion and prejudice,' 'gross excessiveness,' or whether the verdict was 'against the great weight of the evidence'" – all standards similar to the "so obviously weak" language – approximate "the standard . . . articulated in *Jackson*[.]" *Honda Motor Co., Ltd. v. Oberg,* 512 U.S. 415, 432 n.10 (1994). Even if the Court of Criminal Appeals used language not traditionally associated with the *Jackson* standard, the use of that phraseology does not differ significantly from the language traditionally employed in *Jackson* cases. Swearingen, however, objects to more than the employ of the singular phrase "so obviously weak." Swearingen argues that the interjection of that phrase entirely supplanted the federally endorsed *Jackson* standard with Texas' *Clewis* review. In Swearingen's view, the objected-to words signaled that the Court of Criminal Appeals viewed the prosecution's evidence "by itself" as authorized by the *Clewis* standard, independent from *Jackson*'s totality-of-the-evidence review. *Zuniga v. State*, 144 S.W.3d 477, 483 (Tex. Crim. App. 2004) (finding that *Clewis* jurisprudence "articulate[d] two ways in which evidence might be factually insufficient. First, *when considered by itself*, the evidence supporting a vital fact is too weak to support the finding. The second is a balancing scale where there is evidence on both sides, both supporting and contrary to the verdict.").

28

Swearingen ignores the fact that, in the same sentence as the challenged language, the Court of Criminal Appeals stated that it reviewed the "totality of the evidence." *Swearingen*, 101 S.W.3d at 96. The Court of Criminal Appeals' analysis acknowledged the existence of different interpretations of the evidence and that "a rational jury could have entertained a reasonable doubt regarding Swearingen's guilt." *Id.* at 96. The Court of Criminal Appeals' legal analysis, absent the singular "so obviously weak" phrase, mirrors the *Jackson* framework. The Court of Criminal Appeals reviewed whether a rational juror could have found Swearingen guilty beyond a reasonable doubt – the same review required by federal law. The Court of Criminal Appeals' augmentation of the *Jackson* standard with the "so obviously weak" language did not seem to change materially the manner in which it viewed the trial evidence.

Importantly, the Court of Criminal Appeals' sloppy use of *Clewis*' "so obviously weak" language did not cause that court to view Swearingen's claims in any harsher light than under an unadulterated *Jackson* standard. The *Clewis* standard, unlike the prosecution-friendly *Jackson* standard, "dictates that the evidence be viewed in a neutral light, favoring neither party." *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000). If the Court of Criminal Appeals tainted its *Jackson* review with a state law standard, that action could only favor Swearingen.[12] Thus, the resultant analysis hardly contradicted or reached a different outcome than the *Jackson* standard required, at least insofar as it would not prejudice a habeas petitioner. *See Williams*, 529 U.S. at 405 ("The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.' The text of § 2254(d)(1) therefore suggests that the

---

[12]     As evidence that a *Clewis* standard employs a more lenient analysis than *Jackson*, one need not look any further than the dissent in Swearingen's case which found the evidence sufficient under *Jackson*, but would have ordered a new trial under *Clewis*.

state court's decision must be substantially different from the relevant precedent of this Court.").

The Court of Criminal Appeals' use of the *Jackson* standard in its review of Swearingen's legal sufficiency claim complied with the AEDPA's statutory expectations. Swearingen has not shown that the Court of Criminal Appeals "appl[ied] a legal standard contrary to those set forth in [Supreme Court] cases . . . [or] confront[ed] a set of facts indistinguishable from those presented in any of [the Supreme] Court's clearly established precedents." *Vincent*, 538 U.S. at 640. "While its decision was thus not 'contrary to clearly established Federal law,' it could be an 'unreasonable application' thereof." *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001) (quoting *Williams*, 529 U.S. at 413), *cert. denied*, 535 U.S. 982 (2002).

D.      "An Unreasonable Application of Clearly Established Federal Law"

This Court can only grant habeas relief if Swearingen shows that the Court of Criminal Appeals unreasonably applied *Jackson*. 28 U.S.C. § 2254(d)(1). Swearingen's arguments lie at the intersection of two highly deferential standards of review. As previously noted, the AEDPA authorizes a deeply forgiving review of state-court determinations. In habeas sufficiency-of-the-evidence claims, the constitutionally deferential *Jackson* standard converges with the statutorily mandated federal habeas standards to create a most daunting burden for federal petitioners. *See Garcia v. Carey*, 395 F.3d 1099, 1103 (9th Cir. 2005) (noting that the AEDPA "adds a second level of deference" to the *Jackson* standard)*; Torres v. Mullin*, 317 F.3d 1145, 1151 (10th Cir. 2003) ("[The] AEDPA ha[s] added an additional degree of deference to state courts' resolution of sufficiency of the evidence questions."), *cert. denied*, 540 U.S. 1035 (2003). A prisoner must not only show that a rational juror could not have convicted him of capital murder, he must show that the state court was unreasonable in its assessment of his arguments. The doubly

30

deferential standard utilized in habeas insufficiency claims creates a high, though not insurmountable, barrier to federal habeas relief.  The Court, therefore, reviews the state court's prosecution-friendly *Jackson* analysis not for error, *per se*, but to decide if the Court of Criminal Appeals unreasonably applied *Jackson* to Swearingen's case or if it refused to extend *Jackson* to the operative facts of the case.  *See Williams*, 529 U.S. at 407.

The trial court instructed the jury on both kidnapping and sexual assault, including the attempted commission of both, as theories to support Swearingen's conviction.  The jury's verdict did not specify whether the jury found Swearingen guilty under the kidnapping or sexual-assault precursor.  Clerk's Record Vol. 20 at 2882.  Accordingly, Swearingen's petition only merits habeas relief after he shows that insufficient evidence supported *both* the kidnapping and sexual assault charges.  *See Santellan*, 271 F.3d at 196 ("[W]here a jury is given the option of choosing between factually adequate and factually inadequate theories of guilt, jurors 'are well equipped to analyze the evidence' and can be counted upon to base their verdict upon the factually adequate theory.").

1.      Evidence Supporting a Capital Conviction Based on Kidnapping

Swearingen alleges that insufficient evidence showed that he kidnapped Ms. Trotter. This Court applies the *Jackson* standard "with explicit reference to the substantive elements of the criminal offense as defined by state law."  *See Jackson*, 443 U.S. at 324 n.16.  The trial court instructed the jury that it could find Swearingen guilty of capital murder if he kidnapped, or attempted to kidnap, Ms. Trotter.[13]  Texas law defines kidnapping as when a person "intentionally

---

[13]      The trial court's instructions, which followed state law, required the jury to find the following:

(continued...)

or knowingly abducts another person."  TEX. PENAL CODE art. 20.03(a).  Texas defines abduct as

"to restrain a person with intent to prevent his liberation by secreting or holding him in a place

where he is not likely to be found; or using or threatening to use deadly force."  TEX. PENAL CODE

art. 20.01(2)(A), (B).  "'Restrain' means to restrict a person's movements without consent, so as to

interfere substantially with the person's liberty, by moving the person from one place to another or

by confining the person."  TEX. PENAL CODE art. 20.01(1).[14]  The Court of Criminal Appeals expects

Texas juries to give "plain meaning" to the "unambiguous" language used in the kidnapping statute.

---

[13]         (...continued)
A person commits the offense of kidnapping if he intentionally or knowingly abducts another person.

"Abduct" means to restrain a person with intent to prevent his liberation by secreting or holding him in a place where he is not likely to be found, or by using or threatening to use deadly force.

"Restrain" means to restrict a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person.

Restraint is "without consent" if it is accomplished by force, intimidation or deception.

"Deadly force" means force that is intended or known by the person acting to cause, or in the manner of its use or intended use is capable of causing death or serious bodily injury.

Clerk's Record Vol. 20 at 2875.

[14]         On direct appeal, the Court of Criminal Appeals improperly defined "restrain without consent" as being accomplished by force, intimidation, or *coercion*.  *Swearingen*, 101 S.W.3d at 95. The trial court properly instructed the jury that a restraint without consent involved force, intimidation, or *deception*.  Clerk's Record Vol. 20 at 2875; *see also* TEX. PEN. CODE § 20.01(1)(A). There is no indication that this improperly affected the Court of Criminal Appeals' rejection of Swearingen's *Jackson* claim.

*Hines v. State*, 75 S.W.3d 444, 447 (Tex. Crim. App. 2002).  Thus, "a kidnapping becomes a completed offense when a restraint is accomplished, and there is evidence that the actor intended to prevent liberation and that he intended to do so by either secretion or the use or threatened use of deadly force."  *Brimage v. State*, 918 S.W.2d 466, 475 (Tex. Crim. App. 1994), *cert. denied*, 519 U.S. 838 (1996)

Swearingen's habeas petition challenges the kidnapping precursor's viability because "[n]one of the witnesses the State produced who saw M[s]. Trotter with Mr. Swearingen on the day she disappeared could testify that Mr. Swearingen was exerting any sort of force over Ms. Trotter." (Instrument No. 21 at 22).  Swearingen's later pleadings challenge specific items of evidence tending to prove that he kidnapped Ms. Trotter, most particularly the evidence showing that she experienced trauma to the left side of her face.  Swearingen places special emphasis on the dissent from his direct review which, in the context of a state law *factual* sufficiency analysis, noted that "no evidence was presented to prove that [he] took a still-living Trotter to the woods involuntarily." *Swearingen*, 101 S.W.3d at 105 (Johnson, J., dissenting).[15]  Throughout his pleadings, Swearingen also criticizes the prosecution's use of the "Spanish letter" to provide context to the murder.

Swearingen murdered Ms. Trotter and abandoned her body in the woods.  The physical evidence provided cloudy insight into the circumstances surrounding her death, particularly due to the degraded and desecrated condition of her body when found weeks later.  Contrary to Swearingen's arguments, the fact that Ms. Trotter voluntarily entered Swearingen's truck at the

---

[15]     The two dissenting judges, however, found that "the evidence is legally sufficient to support the verdict on the theory of kidnapping[.]" *Swearingen*, 101 S.W.3d at 101 (Johnson, J., dissenting).  The dissenting judges agreed with the majority that *Jackson*'s deferential standards required the rejection of Swearingen's legal insufficiency claim.

college campus does not mean that Swearingen did not commit a kidnapping before killing her.  *See, e.g., Boyle v. State*, 820 S.W.2d 122, 138 (Tex. Crim. App. 1989) ("[S]imply because [the victim] voluntarily accompanied the [defendant] in his truck, does not preclude the possibility that at some time during the course of the journey with the [defendant] a murder in the course of a kidnapping subsequently occurred."), *cert. denied*, 503 U.S. 921 (1992).  In fact, the prosecution never alleged that Swearingen kidnapped Ms. Trotter from the campus, instead arguing that the kidnapping probably never occurred until the two went to Swearingen's residence, at the earliest.  The prosecution's closing argument even emphasized that, upon leaving campus, Swearingen and Ms. Trotter likely stopped at a convenience store and purchased chicken nuggets and cigarettes – an unlikely event if Swearingen had already kidnapped Ms. Trotter.  Tr. Vol. 34 at 81.[16]

At some point after leaving the campus, Swearingen killed Ms. Trotter.  Nonetheless, Swearingen correctly recognizes that the physical evidence before the jury did not definitively show where Ms. Trotter died.  The physical evidence placed Ms. Trotter in at least three locations other than the convenience store after leaving the college campus in Swearingen's company: in (1) Swearingen's residence; (2) Swearingen's truck; and (3) the forest where hunters discovered her corpse.  The physical evidence did not explicitly fix the location at which she died.  Swearingen argues that, because there is no evidence proving that Ms. Trotter was still alive when he took her to the woods, insufficient evidence supported a kidnapping theory.

The prosecution did not rely on one theory of where Swearingen kidnapped and killed

---

[16]     A search of the Swearingen residence found cigarettes of the same type as those smoked by Ms. Trotter.  The autopsy found partially digested chicken in Ms. Trotter's stomach.  The search of Swearingen's residence discovered partially eaten chicken nuggets in a McDonald's food container.  The convenience store which sold the cigarettes found in the Swearingen residence also housed a McDonald's restaurant.

Ms. Trotter, but instead outlined various scenarios that may have resulted in her death.  As one theory, the prosecution argued that, regardless of where Swearingen killed Ms. Trotter, the circumstances of the murder alone showed that he kidnapped her as Texas law defines that offense. The prosecution's closing argument asserted: "We don't have to show precisely where she died.  She died at [Swearingen's residence], she died in the truck or she died in the National Forest."  Tr. Vol. 34 at 21.  The prosecution reminded the jury that "[k]idnapping occurs if you have an abduction. An abduction involves restraint. . . .  Restraint is if you confine someone or you move them from one place to another.  Was she confined?  Yes.  Do you think that she wanted to stay and have some more fun?  I think we all can agree that the moment he started to strangle her, the last thing she wanted was to be anywhere near him."  Tr. Vol. 34 at 27.[17]  The prosecution further argued that "[a]n abduction takes place if you use deadly force.  The ligature in this case is obviously deadly force.  It is what caused her death . . . ."  Tr. Vol. 34 at 27.[18]

The prosecution, in essence, argued that a strangulation by its nature was an attempt

---

[17]    The prosecution also alleged that Swearingen transported Ms. Trotter against her will, apparently while she still lived: "Did he move her from one place to another?  Obviously at some point in time, he removed her to the National Forest and dumped her."  Tr. Vol. 34 at 27.

[18]    The prosecution stated that

The cause of death in this case is strangulation. . . .  Strangulation was the way that Melissa Trotter died.  She was strangled by that piece of hosiery.  Strangulation isn't an easy death. . . .  [I]t's not simple.  It's not quick.  You're conscious at least a minute . . . possibly two.  And you're conscious, you're aware that you're dying, and there's nothing you can do to stop it.  Look at the knot on that ligature.  None of us knows what happened to her and how this happened, but there's no way she could have undone that knot from behind her neck as she is strangling, trying to remain conscious, thinking of the people that she loved, thinking of things she'll never do.

Tr. Vol. 34 at 22-23.  While this argument is persuasive in isolation, the evidence also suggests that Ms. Trotter may have been unconscious from a blow to her head before Swearingen strangled her.

to confine a person with the use of deadly force for a period of time, often lasting several minutes, before death occurs.   While not clear whether murder by strangulation automatically entails a kidnapping, Texas law holds that the means of accomplishing murder and the act of kidnapping need not be separate deeds.   *See King v. State*, 29 S.W.3d 556, 563 (Tex. Crim. App. 2000).   Trial counsel's closing argument observed that

> [t]here is a debate in Texas law over when a murder becomes a kidnapping.   It is difficult to perceive a situation where that issue might not arise.   Some examples would be assassination, perhaps, someone stands off at a distance whose objective is to assassinate another person.   So they fire a gun, they are not on top of him, but supposed that assassin decides, rather than using a firearm, he is going to garrote or strangle and he wraps the ligature around the person whom he is about to assassinate's neck, does that act convert a murder to a kidnapping also?   Th[at], I believe,  demonstrates the issue that you are faced with in this case in considering kidnapping.   Does the act of strangling someone constitute kidnapping? So what you have to do then is go back and look at your definition of kidnapping.   Is that short time span between someone's death and the time of strangulation begins sufficient to constitute a substantial interference.   It may be.   Or is it not?   And I suggest then you have to fall back to the other issue . . . of intent.   What is in that person's mind?   Are they meaning to kidnap someone or are they meaning to kill them.   I suggest to you that the law says that in order to have the kidnapping, the guilty mind or culpable mental state must be present in order to constitute the kidnapping, that just because a person may kill someone and that intent is to kill, and there's no intent to kidnap, that that act of strangling doesn't turn a murder into kidnapping.   That I suggest will be the major consideration in this case if you find the offense of murder was committed.

Tr. Vol. 34 at 61-62.

As noted by trial counsel, the jury could only find that Swearingen attempted to kidnap Ms. Trotter or completed a kidnapping under that scenario if he intended to restrain her by using deadly force.   Texas law "imposes no minimal requirement for restrain other than the interference with the person's liberty be substantial."  *Santellan v. State*, 939 S.W.2d 155, 163 (Tex. Crim. App. 1997).  "[T]here is nothing in the Texas statute that even *suggests* that it is necessary for the State to prove that a defendant moved his victim a certain distance, or that he held him a specific

36

length of time before he can be found guilty of kidnapping." *Hines*, 75 S.W.3d at 447.  "[A]ll that the State must prove is that a person was restrained with the intent to prevent his liberation and that restraint was accomplished by the use or threat to used deadly force." *Boyle*, 820 S.W.2d at 138. "If this restraint is accomplished through 'force, intimidation, or deception' it is without the victim's consent." *Id.* The strangulation of Ms. Trotter meets those abstract definitions of kidnapping.

While Swearingen now disputes whether the nylon around Ms. Swearingen's neck was held tight enough to cause her death, his own expert witness conceded that Ms. Trotter died from asphyxiation caused by the hosiery ligature.  Tr. Vol. 32 at 111.  The only question would be whether Swearingen applied that deadly force in an effort to restrain Ms. Trotter or only to kill her. Kidnapping may depend on whether the defendant exhibited a desire "to maintain physical control" over the victim. *Hines*, 75 S.W.3d at 448.  "Intent and knowledge are fact questions for the jury, and are almost always proven through evidence of the circumstances surrounding the crime.  A jury may infer intent from any facts which tend to prove its existence, including the acts, words, and conduct of the accused, and the method of committing the crime and from the nature of wounds inflicted on the victims." *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999).  The jury could consider the strangulation in connection with other evidence, especially the physical evidence at Swearingen's residence.   Several items of evidence placed Ms. Trotter in Swearingen's residence – she left cigarettes and a lighter there, her jacket contained fibers from the carpet in the master bedroom, Swearingen strangled her with a piece of hosiery cut from pantyhose found in the residence, and a witness saw Swearingen's truck at his residence in the relevant time period. Swearingen's wife testified that their bed had been disturbed and their residence in disarray when she returned from work that night.  A police officer who responded to Swearingen's false claim of

37

a burglary that night also noted the disorderliness of their residence.  The physical evidence showed that Ms. Trotter could have suffered three injuries: a blow to the head, strangulation with a ligature, and a knife wound to the throat.  A rational juror could believe from the evidence that Swearingen attacked Ms. Trotter in the bedroom, striking her in the head.  Testimony suggested that the rip in Ms. Trotter's pants did not come from being dragged in the woods, but could have come from Swearingen grabbing her as she tried to escape.  Also, the police found in Swearingen's residence the hosiery from which he cut the portion with which he choked Ms. Trotter.  From that context, the jury could find that some event in the Swearingen residence caused disarray and ended in Ms. Trotter's strangulation.  The jury would not be irrational in inferring that those circumstances implied a showing of force to restrain Ms. Trotter and that the strangulation in those circumstances prevented Ms. Trotter's liberation, at least until she became unconscious or died.

The exact moment of Ms. Trotter's death would not be material under that scenario.  By disabling Ms. Trotter by the blow to her head, or by ripping her jeans as she tried to escape, or by choking her with the pantyhose, and most likely a combination of those actions, Swearingen could have restrained Ms. Trotter, intending to prevent her liberation by deadly force.  The fact that the sharp cut to Ms. Trotter's throat occurred before her death, but that her corpse bore no defensive wounds, only strengthens the prosecution's argument that Swearingen intended to restrain, and thus kidnap, her before he killed her.

The evidence, however, did not unequivocally place her kidnapping in the trailer.  Within Swearingen's truck, the police found hairs that had been forcibly removed from Ms. Trotter's head.  The bruising on the left side of Ms. Trotter's face could have resulted from being stricken by Swearingen as he drove his truck with her in the passenger seat.  Her hair on the headboard and

38

other areas of the truck could have fallen off during a struggle therein.  The evidence would also allow the jury to find that Swearingen at some point while transporting Ms. Trotter used force against her, as suggested by her forcibly removed hair and possible bruising to the face, and then transported her to the woods or to his residence to kill her, before dumping her body.  While the evidence itself does not specify the order or location of events that transpired before Ms. Trotter's death, the whole of the circumstances would allow a jury to infer that, at some point, Swearingen intended to use deadly force to restrain Ms. Trotter and transport her against her will.[19]

The prosecution emphasized, and the Court of Criminal Appeals relied on, the "Spanish letter" to provide context to the kidnapping:

> Based on the circumstantial evidence presented at trial, a rational jury could have concluded that: Trotter left the college with Swearingen in his truck. After she ate some chicken and green vegetables, he made sexual advances which she rejected. This rejection upset him and he hit her on the left side of her face.  Then, through the use of the force or intimidation created by having hit her, he restrained her and substantially interfered with her liberty by confining her in his truck while moving her to the forest without her consent and that he did so with the intent to prevent her liberation by either secreting her in a place where she was not likely to be found or by using or threatening to use deadly force. . . .  A rational jury could conclude that Swearingen compelled Trotter to submit or participate in such action by the use of physical force and without Trotter's consent, as indicated by Trotter's statement that she needed to go home when the conversation turned to sex. A rational jury could then find that Swearingen did attempt to, and succeeded in causing Trotter's death in the course of the same criminal episode.

---

[19]    The trial evidence sharply contrasts to the logical extension of Swearingen's construction of events, keeping in mind that the evidence proved that he murdered Ms. Trotter. Under Swearingen's version of the events, the jury would have to believe that Ms. Trotter voluntarily accompanied Swearingen to his residence where she left her cigarettes and lighter, lay on his carpet, and disturbed his bed.  From there, she accompanied Swearingen in his truck, possibly lying in its bed, to the woods.  There in the woods, she allowed Swearingen to carry or drag her from the car, losing a shoe in the process, and allowed him to strike her in the head, stab her in the throat, and throttle her with hosiery he carried from his apartment.  This construction of events defies logic. A rational jury viewing the entire evidentiary picture could reasonably conclude that Swearingen kidnapped Ms. Trotter before her death.

*Swearingen*, 101 S.W.3d at 97.  While the trial evidence did not prove the exact moment of Ms. Trotter's death in relation to the events that led to her being dumped in the woods, the Court of Criminal Appeals relied on the "Spanish letter's" explanation that the murderer struck Ms. Trotter and then transported her to the woods, where he strangled her.  This sequence of events supported other inferences that the jury could make from the evidence, particularly the evidence placing Ms. Trotter in Swearingen's truck, the evidence showing that she suffered a brutal blow to her head, the condition of her body without any indication of a struggle, and the location of her body.  All this evidence becomes more compelling as the "Spanish letter" had the murderer strike Ms. Trotter in one location, but then strangle her in another, suggesting that Swearingen restricted Ms. Trotter's movements and then transported her, thus meeting the statutory requirements to show kidnapping.

Significant questions arise from the prosecution's use of Swearingen's "Spanish letter" to establish the events leading up to Ms. Trotter's murder.  Swearingen argues that, since he fabricated the contents of the "Spanish letter," and its translation made little sense in parts, that letter serves as an inadequate and unreliable basis to determine the evidence's sufficiency.  The Court of Criminal Appeals obviously grappled with the letter's use:

> Swearingen's letter was not a confession or testimony presented by the defendant as the truth, which the jury could believe or disbelieve based on their evaluation of his credibility.  Instead, it was shown to be a fabrication created by Swearingen.  It contained some information contrary to the remainder of the evidence, such as the description of another man and another vehicle involved. It contained other information consistent with undisputed facts such as the cause of death, the location of the body, and the color of Trotter's underwear. It also contained some information that could have been truth or fiction, such as the statement that she said she had to go home when he began to talk about sex, that he hit her, that it was after he hit her that he took her to the woods, and that it was there that he began to choke her.  The jury's determinations regarding the veracity of such information was supported by the jury's determinations regarding other evidence, such as the food found in Trotter's stomach, the advanced decomposition of the left side of her face, and Swearingen's earlier comments regarding his intent to have sex with Trotter. Thus

supported, the letter provided a time line with which to place the physical evidence
into context and an explanation for how the criminal episode began.

*Swearingen*, 101 S.W.3d at 96-97.[20]  Whatever problems may exist in evaluating the truth of the statements in the "Spanish letter," the *Jackson* standard disallows a federal habeas court to turn a jaundiced eye to prosecutorial evidence.  Federal law requires this Court "to accept all credibility choices that tend to support the jury's verdict."  *United States v. Johnston*, 127 F.3d 380, 401 (5th Cir. 1997) (quotation omitted), *cert. denied*, 522 U.S. 1152 (1998); *see also Glasser v. Untied States*, 315 U.S. 60, 80 (1942) ("It is not for us to weigh or to determine the credibility of witnesses.  The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it."); *United States v. McKenzie*, 768 F.2d 602, 604 (5th Cir. 1985) ("We cannot reassess the validity of their decision, but must accept all credibility choices that tend to support the jury's verdict."), *cert. denied*, 474 U.S. 1086 (1986).  "[C]redibility determinations

---

[20]      While the dissent on direct appeal found the evidence factually insufficient to support Swearingen's conviction, the dissent also found that the 'Spanish letter" adequately supported the verdict under the *Jackson* inquiry:

> The admittedly counterfeit letter that Ronnie Coleman copied contained some facts about the crime which were unknown to the public and consistent with the forensic evidence (e.g. the red panties), and other facts which were obviously not true (e.g. breakfast, her car, black rope). From this mixture of some accurate information, factual inconsistencies, and obvious falsehoods, the prosecutor hypothesized that the statements made by the author necessarily support a finding that appellant kidnapped Trotter.

> While the prosecutor's hypothesis is weak, given the readily apparent falsehoods surrounding both the creation and content of the spurious letter, I would hold that the inferences which may reasonably be drawn are legally sufficient to support a verdict of guilty of murder in the course of kidnapping Trotter. I would overrule point of error one.

*Swearingen*, 101 S.W.3d at 104 (Johnson, J., dissenting).

41

. . . are constitutionally entrusted to the jury and entitled to great deference." *United States v. Baker*, 61 F.3d 317, 321 (5th Cir. 1995) (citing *Jackson*, 443 U.S. at 319); *see also Tibbs v. Florida*, 457 U.S. 31, 45 (1982) ("The trier of fact, not the appellate court, holds 'the responsibility . . . fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'")*; Hicks*, 389 F.3d at 533 ("When there is a conflict over testimony, the court will defer to the fact finder's resolution with respect to the weight and credibility of the evidence."). When reviewing the trial record, a court must be careful not to superimpose its own reinterpretation of the evidence, but instead look at the trial evidence in a light most favorable to the prosecution. *See Jackson*, 443 U.S. at 319 ( "Once a defendant has been found guilty of the crime charged, the factfinder's role as a weigher of evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution."). To that end, "[a]ll credibility choices and conflicting inferences are to be resolved in favor of the verdict." *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005); *see also Jackson*, 443 U.S. at 326 (holding that a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.").

While significant questions may exist concerning whether Swearingen accurately recorded all the circumstances surrounding Ms. Trotter's murder in his "Spanish letter," this Court must view any credibility questions in a light most favorable to the prosecution's case. In that light, the "Spanish letter" provides context which frames the evidence in a manner allowing a rational jury to find that Swearingen kidnapped Ms. Trotter. Specifically, the "Spanish letter's" contents show

42

that Swearingen intended to restrain Ms. Trotter, and then accomplished the criminal act of kidnapping.  The Court of Criminal Appeals' use of the "Spanish letter" complied with *Jackson* jurisprudence and bolstered its finding that sufficient evidence supported Swearingen's conviction. Given the whole of the trial evidence in a light most favorable to the prosecution considered as required by *Jackson*, the Court of Criminal Appeals did not unreasonably hold that a rational factfinder could base a capital conviction on a kidnapping predicate.  Swearingen fails to show under the AEDPA standard that insufficient evidence supported his conviction for capital murder.  28 U.S.C. § 2254(d)(1).

2.    Evidence Supporting a Capital Conviction Based on Aggravated Sexual Assault

While it is sufficient to find that the trial evidence supported one of the charging alternatives given to the jury, the Court also finds that the trial court did not unreasonably find that sufficient evidence supported a verdict that Swearingen murdered Ms. Trotter in the course of a aggravated sexual assault or attempted sexual assault.  Under Texas law at the time of the offense, a person committed sexual assault by intentionally or knowingly "caus[ing] the penetration of the anus or female sexual organ of another person by any means, without that person's consent," "caus[ing] the penetration of the mouth of another person by the sexual organ of the actor, without that person's consent," or "caus[ing] the sexual organ of another person, without that person's consent, to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor." TEX. PENAL CODE § 22.021(a)(2)(c) (Vernon Supp. 1998).  Texas authorized conviction of an attempted sexual assault if "with specific intent to commit an offense, [a defendant] does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended." TEX. PENAL CODE § 15.01(a).

43

The evidence supporting a finding of aggravated sexual assault appears weaker than that showing a kidnapping.  Nevertheless, the Court of Criminal Appeals found that a reasonable jury could conclude that Swearingen either sexually assaulted Ms. Trotter, or at least attempted to do so:

> Based on the circumstantial evidence presented at trial, a rational jury could have concluded that: Trotter left the college with Swearingen in his truck.  After she ate some chicken and green vegetables, *he made sexual advances which she rejected. This rejection upset him and he hit her on the left side of her face.*  Then, through the use of the force or intimidation created by having hit her, he restrained her and substantially interfered with her liberty by confining her in his truck while moving her to the forest without her consent and that he did so with the intent to prevent her liberation by either secreting her in a place where she was not likely to be found or by using or threatening to use deadly force.
>
> *A rational jury could also have concluded that at some point during the restraint, knowing that Trotter was unconscious or physically unable to resist, Swearingen intentionally committed acts in furtherance of his intent to have sexual relations with her, such as pulling up her bra and possibly penetrating her vagina.*[21]  *A rational*

---

[21]     The prosecution explained its theory of sexual assault as follows:

Sexual assault becomes aggravated if the person sustains serious bodily injury, which includes death or a deadly weapon is used.  That ligature was clearly a deadly weapon.  It caused her death.  Both of those elements are met in this case.  How do we know?  Why do we believe that sexual assault occurred?  That's that one bruise on the vaginal wall that you can't escape. . . . .  I'm sure we're going to hear a lot about how there was no semen, there was no hair, no lacerations.  None of those things have to be present for a woman to be raped.  Does she have to be brutalized in addition to being violated?  No.  You heard that there was semen found on his sheets at Brandon Lane.  You heard his wife tell you that that bed was not the same as she left it that morning.

You can also penetrate outside the vagina, other bodily orifices, including her mouth, which, because of animal activity, insects, was very degraded.  You can penetrate her vagina with something other than his penis.  It says any means. It can be a finger.  Fingers don't leave semen.  He didn't even have to undo the front of her pants, if that's what he wanted to penetrate her with, a finger, because of that giant rip, her entire buttock was exposed.  He easily, easily, could have penetrated her vagina

(continued...)

44

*jury could conclude that Swearingen compelled Trotter to submit or participate in such action by the use of physical force and without Trotter's consent, as indicated by Trotter's statement that she needed to go home when the conversation turned to sex.*  A rational jury could then find that Swearingen did attempt to, and succeeded in[,] causing Trotter's death in the course of the same criminal episode.

*Swearingen*, 101 S.W.3d at 96 (emphasis and footnote added).

In finding that sufficient evidence supported Swearingen's conviction, the Court of Criminal Appeals relied on the "Spanish letter" which contains elements suggesting that Ms. Trotter's murderer attempted to, and possibly succeeded in, sexually assaulting her.  With respect to the sexual assault charge, the "Spanish letter" stated that the murderer struck Ms. Trotter after she rebuffed his sexual overtures.  The letter also demonstrates a knowledge of the color of Ms. Trotter's underwear, a fact not released to the public.[22]  Information in the "Spanish letter" supported

---

[21]    (...continued)
through that hole with his hand.

She was found with her shirt up and her breasts exposed. . . . I submit to you that her shirt was up and her bra was up exposing her breasts because he wanted to cup [*sic*] a feel.  He wanted to get him some that he had been denied.  He had already been made to look bad on one ocassion [*sic*], he had been bragging to all his co-workers how this young thing named Melissa was coming to meet him.  She didn't show.  You heard evidence about how angry he was, how much he was being teased by his co-workers.  Later that night, he was telling his friends that if he was lucky, he was going to have her for lunch.  She had already shown him up once.  She had already embarrassed him once.  Do you really think he was going to allow her to embarrass him again?

He was going to have some kind of sexual contact with Melissa Trotter, no matter what it took.  And the evidence here shows you precisely what it took, that he violated her, and in the process of doing so, he killed her.

Tr. Vol. 29 at 24-27.

[22]    Swearingen argues that, while the news accounts of the crime did not include this information, the medical examiner's report made the color of Ms. Trotter's underwear publicly
(continued...)

45

inferences from the trial evidence that would provide the basis for a sexual-assault conviction.

Applying *Jackson*'s deferential review, the Court of Criminal Appeals found the

following elements from the "Spanish letter" supported his conviction for aggravated sexual assault:

> Although Swearingen's letter did not specifically detail any of his acts in furtherance
> of committing aggravated sexual assault, it did support the hypothesis that Trotter's
> rejection of his sexual advances began the cycle of violence that led to her death.  It
> is a rational inference, supported by forensic evidence, such as Trotter's exposed
> torso and bruised vagina, that Swearingen attempted to carry out his intent after he
> had rendered the initial blow and before he performed the final act of stabbing her
> in the throat "to make sure that she was dead," as he wrote in his letter.

*Swearingen*, 101 S.W.3d at 97.  Considering the trial evidence in a light most favorable to the

prosecution, and using the "Spanish letter" to form inferences about Swearingen's actions, the Court

of Criminal Appeals reached the following conclusion regarding the sufficiency of the evidence

showing the commission of an aggravated sexual assault:

> We cannot say, looking at the totality of the evidence, that the evidence was so
> obviously weak that a rational jury would have necessarily entertained a reasonable
> doubt that appellant intended to have sexual intercourse with Trotter and that he
> attempted to do so despite her desire "to go home" when he started to talk about sex,
> or that he intended to restrain Trotter without her consent and did so by moving her
> to a place where she was not likely to be found and continuing to confine her by
> using what turned out to be deadly force.  If the jury concluded that Swearingen hit
> Trotter for rejecting his sexual advances before driving her to the forest, the
> inferences about which Swearingen complains fall into place. The scenario that
> Swearingen killed Melissa Trotter in the course of kidnapping her in order to
> sexually assault her after she rejected his sexual advances is supported by the
> evidence, thus, the evidence is legally sufficient to support the verdict.

*Swearingen*, 101 S.W.3d at 97.

Swearingen points to several gaps in the prosecution's case to show that insufficient

---

[22]        (...continued)

available.  Swearingen, however, makes no showing that the medical examiner's report was
available to him when he crafted the "Spanish letter" in his jail cell.  This Court cannot speculate
that Swearingen gained that information from the medical examiner's office.

evidence showed that he sexually assaulted Ms. Trotter.  Other than the ripped portion of her jeans, Ms. Trotter's pants and underwear were intact.  The medical examiner found no semen or other biological material indicating sexual activity around the time of her murder.  The medical examiner took a vaginal swab that found a pubic hair that did not match either Swearingen or the victim.  Tr. Vol. 30 at 77-78.  While the medical examiner found evidence of possible vaginal bruising, the defense strongly countered that the bruise did not necessarily indicate sexual activity on Swearingen's part, but may have resulted from other sources.[23]  Overall, Swearingen argues that the sketchy information about the circumstances leading to Ms. Trotter's death fails to show, even by inference, that Swearingen attempted to, or succeeded in, sexually assaulting her as defined by Texas state law.

This Court's limited inquiry focuses exclusively on the question of whether the Court of Criminal Appeals unreasonably applied *Jackson* in finding that sufficient evidence supported Swearingen's conviction.  The Court of Criminal Appeals reviewed the *Jackson* standard and applied that standard to the facts adduced at Swearingen's trial.  The Court of Criminal Appeals found that, when viewing the evidence under the standard required in *Jackson*, sufficient evidence "support[ed] a rational jury's finding the elements beyond a reasonable doubt."  *Swearingen*, 101 S.W.3d at 97.

Using the Spanish letter in connection with the other trial evidence, and viewing the facts under the highly deferential standard required by law, this Court cannot say that the Court of

---

[23]       For the first time in these proceedings, Swearingen submits a report prepared by Dr. Joseph A. Jachimczyk, Harris County Medical Examiner, suggesting that the medical examiner erred in finding vaginal bruising.  This information, which would have been useful at trial, cannot influence a habeas insufficiency-of-the-evidence analysis.

Criminal Appeals unreasonably found that sufficient evidence supported Swearingen's conviction based on aggravated sexual assault or attempted aggravated sexual assault. Admittedly, the evidence only weakly supported Swearingen's conviction based on the sexual-assault theory. Nonetheless, the doubly deferential standards at play in habeas review require this Court to honor Texas' finding of sufficient evidence in this case. The Court of Criminal Appeal's adjudication survives this Court's limited review under the AEDPA. *See* 28 U.S.C. § 2254(d)(1).

## IV.   The Jury Failed to Find Beyond a Reasonable Doubt that Swearingen Murdered Ms. Trotter

Distinct from his claim that the trial evidence failed to provide for his conviction beyond a reasonable doubt, Swearingen claims that the jury's deliberations failed to find him guilty as required by the indictment and the jury instructions. The jury instructions in this case authorized the jury to find Swearingen guilty of murder "by strangling Melissa Trotter *with a piece of hosiery* . . . ." Clerk's Record Vol. 20 at 2876 (emphasis added). During jury deliberations, the jury members sent out a note that read as follows:

> Because it is specified in Sec. III of the charge (Page 3) is it necessary that we believe beyond a reasonable doubt that stranglulation [*sic*] with a piece of hosiery was the cause of death to the exclusion of everything else to consider him guilty of murder?
>
> example – Could we convict if someone believes that a cut to throat or strangulation by human hands was the cause of death.

Clerk's Record Vol. 20 at 2886. Both the prosecution and the defense approved the message sent back by the trial court: "the law does not permit me to answer your question yes or no. Please refer to the Charge for guidance and continue your deliberations." Tr. Vol. 34 at 100.

Swearingen claims that the jury note indicates that the jury found him guilty without relying on the precise instructions in the jury charge. On state habeas review, Swearingen supported

this claim with an affidavit from his investigator, Cynthia Patterson.  Ms. Patterson attested that she had contacted one of the trial jurors, Ms. Geralyn Engman, who told her that the jurors were divided over the cause of death in this case, whether strangulation by the pantyhose or the knife wound to her throat caused Ms. Trotter's death.  Upon receiving the trial court's admonition to refer to the jury charge, the jury members allegedly "just had to figure it out [themselves] and decided that it was fine whichever way [they] believed."  State Habeas Record Vol. I at 174-75 (Affidavit of Cynthia Patterson, dated March 8, 2002).  Swearingen's federal habeas claim relies heavily on Ms. Patterson's affidavit to argue that the jury's failed to convict him of strangling Ms. Trotter *with the pantyhose leg* beyond a reasonable doubt, thus violating the due process clause.

   Respondent contends that this Court must ignore Ms. Patterson's affidavit pursuant to FED. R. EVID. 606(b)'s prohibition against a federal petitioner's post-judgment inquiry into jury deliberations.  Rule 606(b) "is grounded in the common-law rule against admission of jury testimony to impeach a verdict," *Tanner v. United States*, 483 U.S. 107, 121 (1987), prohibiting a juror from testifying as to "the effect of anything upon that or any other juror's mind or emotions as influencing the juror . . . or concerning the juror's mental processes in connection therewith."  FED. R. EVID. 606(b).  "[T]he legislative history of the rule unmistakably points to the conclusion that Congress made a conscious decision to disallow juror testimony as to the jurors' mental processes or fidelity to the court's instructions." *Peterson v. Wilson*, 141 F.3d 573, 578 (5th Cir. 1998).  On its face, Rule 606(b) would prevent this Court from considering the substance of Ms. Patterson's affidavit.

   Ms. Patterson's affidavit suffers from additional evidentiary problems.  Independent of the recitation of facts about the jury's deliberations, Ms. Patterson's affidavit recounts her conversation with trial jurors, relying heavily on hearsay statements.  Swearingen does not provide

any direct statements or affidavits from those trial jurors quoted by Ms. Patterson.  Swearingen

provides no argument that exceptions to the hearsay exclusions in the federal evidentiary rules or

their Texas counterparts would somehow render the investigator's affidavit admissible.  The Federal

Rules would prohibit this Court from considering any affidavit conveying information about the

jury's deliberations, and more especially so when containing nothing but hearsay statements.

Nevertheless, the record does not clearly indicate whether or not the state habeas

court considered Ms. Patterson's affidavit in rejecting Swearingen's habeas claims.  Some question

exists as to whether this Court can find inadmissible evidence presented to the state court and made

part of the habeas record.  *See Loliscio v. Goord*, 263 F.3d 178, 188 (2d Cir. 2001) ("It is one thing

to say that Rule 606(b) applies to juror testimony introduced for the first time in a federal habeas

evidentiary hearing, but quite another to say that, in reviewing a state court's determination of

whether a defendant was prejudiced by the jury's consideration of extra-record information, a

federal habeas court should 'independent[ly] determin[e]' whether the petitioner was prejudiced by

the extra-record information without the benefit of any juror testimony that offends Rule

606(b)--even if such testimony had been relied upon by the state court."); *Doan v. Brigano*, 237 F.3d

722, 735 (6th Cir. 2001) ("In light of the deference to state proceedings called for by AEDPA, it

seems strange indeed that a federal habeas court would apply its own rules of evidence despite a

conflicting state rule when it is simply reviewing the state court record in making its determination,

rather than holding an evidentiary hearing in federal court."); *see also Salazar v. Dretke*, ___ F.3d

___, 2005 WL 1797079 n. 28, at *11 (5th Cir. July 29, 2005) (focusing on Texas' rules of evidence

rather than the federal equivalent when considering jury affidavits).

Without giving explicit indication of whether it considered the substance of the

challenged affidavit, the state habeas court rejected this claim.  In federal habeas cases, this Court must review the "facts in light of the evidence presented in the State court proceedings."  28 U.S.C. § 2254(d)(2).  Nonetheless, Texas' juror-deliberation and hearsay rules have a similar effect to their federal counterparts.  In its state habeas pleadings, the State strenuously argued that Tex. R. Evid. 606 (b) prevented the state habeas court from considering the investigator's affidavit.  State Habeas Record Vol II at 269-72.  The Supreme Court and Fifth Circuit have not yet resolved whether this Court must consider evidence that the federal or state rules would otherwise prohibit because the state courts did not unequivocally reject such evidence.  However, this Court assumes that, since Swearingen provided the state courts no grounds upon which to ignore its well-established procedural law, the state habeas court did not consider the inadmissible affidavit.  The state habeas court's decision does not hint that it considered the inadmissible affidavit.  This Court will not assume that the state court allowed the contents of those affidavits to color its adjudication in violation of its procedural law.

Without the information contained in Ms. Patterson's affidavit, the jury's note alone fails to provide a sufficient basis for habeas relief.[24]  Without the inclusion of the investigator's

_____

[24]     Even taking into account his investigator's affidavit, Swearingen fails to show an entitlement to federal habeas relief.  The state habeas court noted that the jurors "stated that they would based their decisions on the law and the facts presented and that they would hold the State to its burden of proof beyond a reasonable doubt . . . ."  State Habeas Record Vol. II at 478, ¶37.  The trial court's instructions authorized a conviction only if the jury found "beyond a reasonable doubt that . . . SWEARINGEN, did then and there intentionally cause the death of . . . Melissa Trotter, by strangling Melissa Trotter with a piece of hosiery . . ."  Clerk's Record Vol. 20 at 2876, 2877.  The instructions emphasized that "[t]he prosecution has the burden of proving the defendant guilty and it must do so by proving each and every element of the offense charged beyond a reasonable doubt and if it fails to do so, [the jury] must acquit the defendant."  Clerk's Record Vol. 20 at 2880.  When the jurors expressed confusion, the trial court referred them to the jury instructions that made abundantly clear the burden resting on the prosecution. While Ms. Patterson's

(continued...)

affidavit, all Swearingen shows is that the jury possibly debated the cause of Ms. Trotter's death; the record does not indicate the resolution of that debate. This Court will deny Swearingen's claim that the jury failed to find him guilty of capital murder beyond a reasonable doubt.

### CERTIFICATE OF APPEALABILITY

Swearingen has not yet requested that this Court grant him a Certificate of Appealability ("COA"), though this Court can consider the issue *sua sponte*. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). Under the AEDPA, a prisoner cannot seek appellate review from a lower court's judgment without receiving a COA. 28 U.S.C. § 2253(c). "The COA statute establishes procedural rules and requires a threshold inquiry into whether the circuit court may entertain an appeal." *Slack v. McDaniel*, 529 U.S. 473, 482 (2000). A court may only issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Fifth Circuit holds that the severity of an inmate's punishment, even a sentence

---

[24]        (...continued)
affidavit suggests that the jury may have felt that they had to "figure it out" themselves, the affidavit provides no indication that the jurors failed to find, beyond a reasonable doubt, that Swearingen caused Ms. Trotter's death by strangling her with pantyhose. True, Ms. Patterson apparently asked if some jurors thought that Ms. Trotter died from manual strangulation or a knife, and the juror respondent that "we didn't know which may have killed her." Even so, the state habeas court would not be unreasonable in finding that this apparent confusion did not reach the ultimate question of whether the jury found Swearingen guilty beyond a reasonable doubt as required by the jury charge. The challenged affidavit does not identify any juror, including Ms. Engman, who based his finding of guilt on any theory other than strangulation with hosiery. While Ms. Patterson quotes a juror who expressed concern because the jury "didn't know [whether strangulation or the knife wound] killed her" the affidavit does not clearly show that, after sending the note, the jury did not find Swearingen guilty as required by the jury instructions. Ms. Patterson's affidavit simply does not indicate that the jury did not follow the trial court's admonition to follow the charge. Even if the state habeas court considered the problematic affidavit, it would not be unreasonable in finding that Swearingen failed to meet his burden in showing entitlement to habeas relief. *See* 28 U.S.C. § 2254(d)(1).

of death, "does not, in and of itself, require the issuance of a COA." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000), *cert. denied*, 531 U.S. 831 (2000).  The Fifth Circuit, however, anticipates that a court will resolve any questions about the need for a COA in the death-row inmate's favor.  *See Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir.), *cert. denied*, 531 U.S. 966 (2000).  The Supreme Court has explained the standard for evaluating the propriety of granting a COA on claims rejected on their merits as follows: "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy §§2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack*, 529 U.S. at 484; *Miller-El*, 537 U.S. at 336-38.  On the other hand, a district court that has denied a habeas petition on procedural grounds should issue a COA "when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.  *Slack*, 529 U.S. at 484; *Miller-El*, 537 U.S. at 336-38.  Unless the prisoner meets the COA standard, "no appeal would be warranted."  *Slack*, 529 U.S. at 484.

Swearingen's petition raises several issues worthy of judicial review.  Having considered the merits of Swearingen's petition, and in light of the AEDPA's standards and controlling precedent, this Court nevertheless determines that a COA should not issue on most of Swearingen's claims.  This Court, however, finds that reasonable jurists may find the resolution of Swearingen's insufficiency-of-the-evidence claim debatable.  For that reason, this Court issues a COA with respect to Swearingen's *Jackson* claim.

## CONCLUSION

Based on the forgoing, Swearingen fails to show that he is entitled to federal habeas relief.  This Court, therefore, **GRANTS** Respondent's summary judgment motion, **DENIES**

Swearingen's federal habeas petition, and **DISMISSES** this case **WITH PREJUDICE**.  This Court

will issue a Certificate of Appealability only as to Swearingen's insufficiency-of-the-evidence claim.

SIGNED at Houston, Texas, this 9th day of September, 2005.


_____

Melinda Harmon
United States District Court